***********
Given the circumstances of this case, the undersigned filed an order on 16 June 2000 ordering the plaintiff to undergo an independent medical examination. The plaintiff initially selected Dr. Moore. Defendants denied this choice. Defendants in turn suggested Drs. Markworth or Carter. The plaintiff declined these choices. On 12 December 2000, the undersigned filed an order directing the plaintiff to undergo an independent medical examination by an unspecified Doctor at the Southeastern Orthopaedic Clinic. The examination was thereafter scheduled with Dr. Landon B. Anderson. In May 2001, before the examination was to take place, Dr. Anderson received a letter from counsel for defendant to which the plaintiff objected. The plaintiff furthermore made a motion to remove Dr. Anderson as the examining physician. Dr. James A. Nunnely was thereafter named by the Commission to conduct the IME. The plaintiff underwent an examination by Dr. Nunnely on 12 July 2002. Dr. Nunnely's records from this examination are HEREBY ADMITTED INTO EVIDENCE.
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Taylor along with the briefs and arguments on appeal, as well as the additional medical evidence. The appealing party has not shown good ground to receive further evidence or to amend the prior Opinion and Award. Accordingly, the Full Commission adopts and affirms, with some modification, the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
3. An employee-employer relationship existed between the parties on or about May 24, 1996.
4. The plaintiff was injured by accident on or about May 24, 1996. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
5. The plaintiff's average weekly wage is $428.00, yielding a compensation rate of $285.35.
6. The parties stipulated into evidence the following Industrial Commission forms: 18, 19, 33, 33R and 60.
7. The parties stipulated into evidence as Stipulated Exhibit 1, without need for further authentication or verification, Defendants' Answers to The plaintiff's First Set of Interrogatories and Request for Production of Documents.
8. The parties stipulated into evidence, without need for further authentication or verification, medical records from the following providers:
• Wilmington Orthopaedic Group;
• New Hanover Regional Medical Center;
• Coastal Orthopaedics;
• Cape Fear Memorial Hospital;
• Carolina Sports Medicine; and
• Concentra Managed Care, Inc.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, the plaintiff was a 53-year-old female born August 5, 1944.
2. On May 24, 1996, the plaintiff was employed with defendant-employer as an outside marketing representative and had been so employed for three years. On that date, the plaintiff was working in Shallotte and while making a cold call at the Food Lion, her right foot slipped and she fell down on her left knee and right arm. The plaintiff finished with her visit and left as quickly as possible because she was embarrassed. The plaintiff returned to defendant-employer and reported her injury to her supervisor. The plaintiff completed an Associate Statement, indicating that she had slipped and fallen and struck her arm and reported the parts of her body injured as knee and back.
3. The plaintiff presented at Cape Fear Hospital Occupational Health Services on May 29, 1996, where Dr. Sue Nelson treated her conservatively.
4. On July 3, 1996, the plaintiff was evaluated by Dr. Sutton at the Wilmington Orthopaedic Group, who continued the conservative treatment.
5. On referral from Cape Fear Occupational Health Services, the plaintiff presented to Dr. Kevin Scully on October 15, 1996, complaining of left knee pain. The plaintiff was diagnosed with a medial meniscus tear, which was surgically repaired by Dr. Scully on November 11, 1996.
6. The plaintiff did not miss any time from work between her May 24, 1996 fall and her November 11, 1996 surgery. The plaintiff did not return to work after her November 11, 1996 surgery until September 9, 1997.
7. On January 17, 1997, the plaintiff first presented to a medical care provider complaining of right shoulder pain. She was given a steroid injection for these symptoms, and on January 31, 1997, was diagnosed by Dr. Scully as having radicular symptoms with a possible ruptured cervical disc and subscapular bursitis.
8. The plaintiff remained out of work due to continuing problems with her left knee, and on April 10, 1997 underwent a second knee surgery.
9. The plaintiff was referred by Dr. Scully to Dr. Mark Rodger and Dr. Rodger saw her on April 17, 1997, complaining of neck, shoulder and arm pain. The plaintiff was diagnosed by Dr. Rodger as suffering from impingement syndrome or bursitis in the shoulder and degenerative disc disease in the neck.
10. On or about September 5, 1997, the plaintiff was released by Dr. Scully to return to work. Because the plaintiff continued to complain of pain and giving way in her knee, the plaintiff was released to return to light duty work. The plaintiff returned to work on or about September 9, 1997 working at the credit desk. The plaintiff was unable to return to her outside marketing job because that job required getting in and out of the car and because a replacement had been hired during her absence. At the end of December, the credit table job was phased out and the plaintiff was moved to the demonstrator job. The plaintiff began as a cooking demonstrator and was required to stoop, squat, kneel, bend to clean and sterilize the cooking table, pull out the cart and perform demonstrations. In January 1998, the plaintiff's knee gave out as she was stooping down, and she spilled the food on the floor. Thereafter, the plaintiff was transferred to a non-cooking demonstrator position.
11. The plaintiff testified that her job as a non-cooking demonstrator exceeded her physical limitations and light duty restriction. However, the plaintiff was offered help by the preparation people to assist her in tearing down and setting up for her demonstrations. There are generally two prep people available. The plaintiff declined this help indicating that she did not want to be a strain on the team and that if the 60-year-old prep person could do it, she could do it.
12. The plaintiff testified that she has missed certain days from work due to knee pain. However, no evidence was presented as to which days were missed or as to how many such days there were and consequently the plaintiff has failed to prove the extent and existence of her disability.
13. The plaintiff continued to have problems with her knee and on February 6, 1998, the plaintiff reached maximum medical improvement and retained a 7% permanent partial disability of the left leg. On that date, Dr. Scully placed the plaintiff under permanent restrictions of no lifting greater than ten pounds, no kneeling, no squatting, no crawling and no repetitive bending or stooping. The plaintiff was also placed under a requirement of frequent position change and limited stair climbing.
14. The plaintiff continued to experience pain in her neck, shoulder and arm and on April 8, 1998, was exhibiting symptoms of carpal tunnel syndrome. On April 15, 1998, after EMG studies, the plaintiff was diagnosed by Dr. Rodger with moderately severe right-sided carpal tunnel syndrome, multi-level degenerative disc disease with possible C-8 radiculopathy on the right and bursitis from impingement syndrome.
15. Dr. Rodger was of the opinion that the plaintiff was not a candidate for neck surgery but was a possible candidate for shoulder surgery and was a definite candidate for carpal tunnel release. Dr. Rodger wrote the plaintiff out of work from March 23, 1998 and continuing for treatment of her shoulder and surgery for her right-sided carpal tunnel syndrome.
16. The plaintiff was paid temporary total disability for all time she was out of work for her knee from November 11, 1996 through September 9, 1997.
17. While Dr. Rodger was of the opinion that the plaintiff's shoulder and neck problems and right-sided carpal tunnel syndrome could have been caused by her May 24, 1996 fall, he would have expected her to have had symptoms significant enough for her to mention them to a doctor within one to two months of the fall. Furthermore, because Dr. Scully was treating the plaintiff during that time, Dr. Rodger was of the opinion that Dr. Scully was in a much better position to comment on causation of the plaintiff's neck, shoulder and hand symptoms because he would have been aware of the plaintiff's complaints.
18. Dr. Scully was of the opinion that the plaintiff's knee condition was directly caused by the plaintiff's May 24, 1996 fall. However, Dr. Scully was of the opinion that the plaintiff's shoulder impingement syndrome, neck and shoulder pain and right-sided carpal tunnel syndrome were not caused by the plaintiff's fall. He was of the opinion that the plaintiff "had a long interval between injury and documentation of the onset of that particular complaint. And the natural of all of us over 40 people is that we do tend to develop impingement syndromes with our shoulders. So if she had a significant complaint of her hand, wrist or shoulder that's documented . . . that might help me make that determination . . . but based strictly on the medical records that I have, I would say that they are unlikely to be related." Dr. Scully was further of the opinion that shoulder bursitis, impingement syndrome and ultimately rotator cuff tear are a continuum that have their origins in anatomic changes that occur as people age, as part of the aging process the bony overhang of the shoulder tends to develop a hook on it causing tissues to pinch against the bone resulting in an impingement syndrome. If this progresses, it can result in a rotator cuff tear.
19. On May 24, 1996, the plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer, an injury to her left knee.
20. As a direct and proximate result of the plaintiff's compensable injury by accident, the plaintiff was unable to engage in physical activities required by her former job or any other job from November 11, 1996 through and including September 9, 1997.
21. The plaintiff returned to work on or about September 10, 1997. On September 10, 1997, the plaintiff returned to full time work with defendant-employer earning the same or greater wage than that which she was earning at the time of her compensable injury.
22. The plaintiff reached maximum medical improvement of her knee on February 6, 1998 and retains a 7% permanent partial disability of the left leg as a direct and proximate result of her May 24, 1996 compensable injury.
23. As a result of the 12 July 2002 examination, Dr. Nunnelly was of the opinion that the plaintiff's neck, shoulder injuries, and carpal tunnel syndrome were not related to the workers' compensation fall. Dr. Nunnelly further clarified that the only injury the plaintiff suffered in the fall was to her left knee.
24. The plaintiff's right-sided carpal tunnel syndrome and impingement syndrome as well as her other shoulder and neck symptoms were not caused or aggravated by her compensable 24 May 1996 injury.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. On May 24, 1996, the plaintiff sustained an admittedly compensable injury by accident arising out of and in the course of her employment with defendant-employer. N.C.G.S. § 97-2(6).
2. As a direct and proximate result of her compensable injury, the plaintiff sustained a left leg injury.
3. As a direct result of her compensable injury by accident, the plaintiff was incapable, because of her work-related physical problems from November 11, 1996 through and including September 9, 1997, to earn the same wages that she was receiving at the time of her injury in the same or in any other employment. N.C.G.S. § 97-29.
4. The plaintiff is entitled to temporary total disability compensation for the period from November 11, 1996 through September 9, 1997, and defendant-employer has paid such compensation to the plaintiff.
5. The plaintiff reached maximum medical improvement of her left knee on February 6, 1998 and retains a 7% permanent partial disability to her left leg as a direct and proximate result of her May 24, 1996 compensable injury by accident. N.C.G.S. § 97-31(15).
6. As a direct result of her compensable injury by accident and her resulting 7% permanent partial impairment of the left leg, the plaintiff is entitled to compensation at the rate of $285.35 per week for a period of fourteen weeks. N.C.G.S. § 97-31(15).
7. The plaintiff's right-sided carpal tunnel syndrome, shoulder impingement syndrome and other neck and shoulder problems were not caused or aggravated by her May 24, 1996 compensable injury.
8. The plaintiff is entitled to have defendant-employer provide all medical treatment arising from her compensable injury by accident to the extent it tends to effect a cure, give relief or lessen the period of disability. N.C.G.S. §§ 97-25; 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Defendant-employer shall pay permanent partial disability compensation to the plaintiff at the rate of $285.35 per week for a period of fourteen weeks for her 7% permanent partial disability of the left leg. This amount has accrued and shall be paid in a lump sum, subject to a reasonable attorney's fee approved in Paragraph 2.
2. A reasonable attorney's fee of 25% of the compensation due under Paragraph 1 of the Award is approved for the plaintiff's counsel and shall be paid by deducting from that sum and paid directly to the plaintiff's counsel.
3. Defendant-employer shall provide to the plaintiff all medical treatment arising from her compensable injury by accident to the left leg to the extent it tends to effect a cure, give relief or lessen the period of disability.
4. Each side shall bear their own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER
 S/____________________ THOMAS JEFFERSON BOLCH COMMISSIONER